Kenneth C. VANTINE and Rebecca Vantine, Plaintiffs,

v.

ELKHART BRASS MANUFACTURING CO., INC., and Wausau Insurance Companies, Defendants.

No. S 82–510.

United States District Court, N.D. Indiana, South Bend Division.

Sept. 30, 1983.

David T. Stutsman, Patricia K. Parker, Elkhart, Ind., for plaintiffs.

Evan E. Steger, Susan B. Tabler, Richard Smikle, Indianapolis, Ind., Edward N. Kalamaros, South Bend, Ind., R. Kent Rowe, South Bend, Ind., for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This action was originally filed in state court on October 7, 1982, against plaintiff Kenneth Vantine's employer and the employer's workmen's compensation insurance carrier. In that complaint, plaintiffs alleged, *inter alia,* that Kenneth Vantine's employment contract rights had been unlawfully terminated by his employer, Elkhart Brass, and that said termination constituted a tortious breach of contract for which both defendants were liable.

On November 12, 1982, defendant Elkhart Brass filed a Petition for Removal pursuant to 28 U.S.C. §§ 1441, 1446. In its petition, Elkhart Brass contended that the gravamen of the plaintiff's complaint was grounded on a theory of liability under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Because there is clearly no basis for diversity jurisdiction under 28 U.S.C. § 1332, the jurisdiction of this court over the claims presented must be predicated on a federal question theory under 28 U.S.C. § 1331 and 29 U.S.C. § 185.[1]

The defendant Elkhart Brass filed its motion for summary judgment on July 5, 1983, and defendant Wausau filed a similar motion on July 22, 1983. Hearing and oral argument were held in open court on both motions on September 9, 1983. These motions are now ripe for ruling, and each will be addressed in its turn.

---

1. Although none of the parties to this action have challenged this court's jurisdiction, this court is less than comfortable with the putative jurisdictional reach of 29 U.S.C. § 185 as applied here. In this case this court is called upon to rule on two questions of state substantive law, despite the clear absence of 28 U.S.C. § 1332 jurisdiction. There is the feeling here that such overextends this court's subject matter jurisdiction. See this court's opinion in *Eby v. Allied Products, Inc.,* 562 F.Supp. 528 (N.D. Ind.1983) (a defendant cannot ordinarily on removal go beyond the face of plaintiff's complaint in order to assert federal jurisdiction). Apparently, *Metz v. Tootsie Roll Industries et al,* 715 F.2d 299 (7th Cir.1983) is also authority for subject matter jurisdiction under 29 U.S.C. § 185.

The original complaint filed in the Elkhart Superior Court No. 2 is in one pleading paragraph, with a total of seventeen numbered, rhetorical paragraphs. The plaintiffs make various allegations in the first twelve paragraphs, and the balance attempt to assert claims which sound entirely in tort. They are as follows:

(a) that the actions alleged in paragraphs 1 through 12 constitute willful, wanton, reckless and oppressive action by the defendants, designed to deprive Kenneth Vantine of his employment and workmen's compensation benefits;

(b) that each of these actions were fraudulent and tended to deprive Kenneth Vantine of his employment and workmen's compensation benefits;

(c) that each of these actions was grossly negligent and oppressive and intended to deprive to Kenneth Vantine of his employment and workmen's compensation benefits;

(d) that each of these actions constituted retaliatory acts against Kenneth Vantine due to his (Kenneth's) exercise of his rights under the workmen's compensation law of Indiana; and,

(e) that these actions constitute a tortious interference with Kenneth Vantine's employment contract rights and further constitute a breach of his employment contract.

## I. WAUSAU's MOTION

The facts most favorable to the non-moving parties, as found from a review of their complaint, their responses to Wausau's request for admissions and their answers to Wausau's interrogatories, as well as the documents received from the Industrial Board of Indiana are as follows:

On January 25, 1980, Kenneth Vantine was employed by Elkhart Brass. On that date he was performing his duties as an employee on the second shift, lifting an indexer weighing approximately 150 to 200 pounds with a chain lift, when he sustained a severe and permanent injury to his back. He reported the injury immediately to his foreman and on the Monday morning following his accident reported it to his employer. He was referred by his employer to the company's physician, Dr. Hastings, of the Simpson Medical Clinic. After a period of treatment by Dr. Hastings, he was referred to Dr. Echeverria for an orthopedic evaluation.

Mr. Vantine was seen at the offices of Dr. Echeverria on February 5, 1980. Following the doctor's physical examination and a review of x-rays, he reported his findings to Dr. Hastings on February 14, 1980 as contained in his consultation letter of February 14, 1980. The report states:

DIAGNOSTIC IMPRESSION; Severe sprain of the L–S Lumbo-sacral (spine).

On May 14, 1980 Wausau requested that Vantine be examined by Dr. Earl Heller, a South Bend orthopedist, in South Bend, on June 19, 1980 at 8:00 a.m. by letter dated May 14, 1980.

As of June 19, 1980 Dr. Echeverria had made no recommendation to Vantine that he undergo surgery on his back. Nevertheless, on June 19, 1980 Dr. Heller told Vantine that he did not believe that surgery was necessary and that Vantine was physically able to return to work at Elkhart Brass. In his report, Dr. Heller said:

It is my feeling that the patient [Mr. Vantine] most likely sustained a lower back strain as a result of the injury that occurred on 1/25/80. However, I was unable to substantiate his continued complaints with any objective physical findings in my office. This patient should be encouraged to increase his activities and I do not find any objective findings that would prevent him from working at this time.

On August 29, 1980 Wausau requested that Vantine go to the offices of Morris S. Friedman, M.C., a South Bend orthopedic surgeon, on October 8, 1980 at 2:00 p.m. for a further evaluation of his condition. The appointment with Dr. Friedman was kept on September 19, 1980. At that time, Mr. Vantine was already aware of the fact that Dr. Echeverria contemplated performing surgery on his back and, in fact, Mr. Van-

tine informed Dr. Friedman thereof. Mr. Vantine knew that such surgery was scheduled by Dr. Echeverria to be performed on October 2, 1980.

On September 25, 1980, Dr. Friedman offered his findings on examination of Mr. Vantine as embodied in a report. Dr. Friedman's report states, in part:

An so, Dr. Echeverria had scheduled Mr. Vantine for a decompression lumbar laminectomy for October 2, 1980. Mr. Vantine was then referred to our office for a second opinion.

My recommendations forst of all, by all means, of course, avoid surgery. Secondly, prescribe a program of exercises for Mr. Vantine ... I should therefore, recommend that Mr. Vantine be assigned to a physical therapist who will supervise his exercise program, who could treat him with lumbar gravity traction, but most important who will encourage him to exercise and become more active for about 4–6 weeks and then I should suggest to Mr. Vantine that he go back to work. I told all of this to Mr. Vantine and suggested to him that he go back to his treating physician, and that he ask this physician to prescribe this program for him and hopefully he will be able to go back to work in another 4–6 weeks.

Notwithstanding the above, Dr. Echeverria performed surgery on Kenneth Vantine's back on October 2, 1980. While the surgery did not reveal a herniated disc, it did involve a lumbar fusion, medically necessary in Dr. Echeverria's opinion.

On October 14, 1980, Wausau sent a letter to Mr. Vantine denying any responsibility for the expense of such surgery or for any temporary total disability beyond six weeks from the date of Dr. Friedman's examination. Wausau denied payment for such surgery expense and suggested to Mr. Vantine that he submit the bills to the group insurance plan with defendant Elkhart Brass.

Because Vantine had an accident arising out of and in the course of his employment with Elkhart Brass, his injury was compensable under the Indiana Workmen's Compensation Act. Ind.Code § 22–3–2–1 *et seq.* Accordingly, Kenneth Vantine and the defendants entered into a so-called Form 12 Agreement as to Compensation on February 7, 1981.

Before any Industrial Board hearings, Wausau paid 39 and ⅝ths weeks temporary total disability benefits for the period January 25, 1980 to October 30, 1980 in a total sum of $5181.42 to Kenneth Vantine. These were part of the workmen's compensation benefits which Wausau paid to Mr. Vantine.

Because of the ongoing dispute regarding payment for Dr. Echeverria's services, a hearing was held on June 15, 1982, before a Single Hearing Member of the Industrial Board of Indiana. The hearing judge entered his Award on June 25, 1982. In that award, the plaintiff was ordered to be given an additional 10⅝th weeks of temporary total disability benefits (from October 30, 1980 to January 13, 1981), and that all medical expenses stemming from the accident be paid, including Dr. Echeverria's surgery. With one minor change not relevant here, that Award was affirmed on appeal by the Full Industrial Board of Indiana on September 9, 1982.

■ The whole matter of whether Dr. Echeverria was an "attending" physician was an issue before the Industrial Board. The court will note that the second issue for determination by the Industrial Board was "additional statutory medical expense especially those of Dr. Echeverria". Under the Indiana Workmen's Compensation Act, the employer's or insurer's obligation to pay medical expenses depends upon whether the medical services were authorized by the employer or the insurer, except in certain recognized situations, such as in medical emergencies. Ind.Code § 22–3–3–4. See also, *Perez v. United States Steel Corp.,* 172 Ind. App. 242, 359 N.E.2d 925 (1977). Regardless of the above, this issue was resolved by the Industrial Board of Indiana in favor of Mr. Vantine, i.e., the Industrial Board awarded Mr. Vantine the medical expenses he incurred with Dr. Echeverria.

Ind.Code § 22–3–3–4 provides, in part:

During the period of temporary total disability resulting from the injury, the employer shall furnish such physician, services and supplies, and the Industrial Board may, on proper application of either party, require that treatment by such physician and such services and supplies be furnished by or on behalf of the employer as the Industrial Board may deem reasonably necessary.

Under the Indiana Workmen's Compensation Act, "disability" is to be distinguished from "impairment". The former means and refers to inability to work while the latter means and refers to loss of physical activity. *Perez, supra.* Furthermore, temporary total disability benefits are intended to compensate the employee for the treatment immediately following the injury, and it is during this period that one's ability to return to work of the same kind or character is relevant to a workmen's compensation award. However, once an injury has stabilized, temporary total disability benefits cease even though the employee is unable, on account of his injury, to resume work of the same character as the work in which he was engaged at the time he received the injury. *Covarubias v. Decatur Casting, Division of Hamilton Allied Corp.,* 171 Ind.App. 533, 358 N.E.2d 174 (1976).

Under the Indiana Workmen's Compensation Act the employee, if so requested by his employer, is required to submit himself to an examination by a duly qualified physician or surgeon, designated and paid by the employer and if he refuses to do so, his right to compensation and his right to prosecute proceedings under the Act are suspended until such refusal or obstruction ceases. Ind.Code § 22-3-3-6.

It is clear that in this case there was a difference of medical opinion among Drs. Heller, Friedman and Echeverria as to whether or not the surgery performed by Dr. Echeverria was medically "necessary". Two of the doctors felt that it was not while one felt that it was. In any event, and as noted above, the Industrial Board ruled in favor of Mr. Vantine by awarding

him the costs of such surgery after full hearings before both the Single Hearing Member and the Full Industrial Board.

Plaintiffs contend that there was no good faith dispute between the parties to the workmen's compensation proceedings over whether or not Dr. Echeverria was rendering "authorized" medical treatment within the meaning of the Indiana Workmen's Compensation Act. However, the award issued by the individual hearing member clearly lists as an issue: "Additional statutory medical expense, especially those of Dr. Echeverria." The individual hearing member made the following findings of fact and conclusions of law, in pertinent part:

It is further found that plaintiff was referred to Dr. Hastings by the employer and that notwithstanding plaintiff's prior contact with Dr. Echeverria, plaintiff was referred for treatment of this specific condition by Dr. Hastings and therefore Dr. Echeverria became the attending physician within the meaning of the Workmen's Compensation Act.

It is further found that notwithstanding the examinations and admonitions of Drs. Friedman and Heller, Dr. Echeverria continued to be the attending physician, and that the expense of Dr. Echeverria constitutes statutory medical expense.

It is apparent, therefore, that there was a dispute between the parties over the medical expenses incurred by Mr. Vantine, for services rendered by Dr. Echeverria, and that the same was an issue for determination by the Industrial Board of Indiana and, further, that such issue was resolved in favor of Mr. Vantine.

Plaintiffs also contend that because of the circumstances involving the handling of this claim, i.e., the dispute that arose over whether Dr. Echeverria was the attending physician, the confusion over the scheduling of appointments with Drs. Heller and Friedman, the termination of temporary total disability benefits and the requesting of a further medical evaluation by Dr. Friedman, the actions of Wausau were done willfully, wantonly, or callously in order to

deprive him fraudulently of workmen's compensation benefits.

Notwithstanding any inconveniences to Kenneth Vantine that may have been occasioned by wrong appointment dates with Drs. Heller and Friedman, as alleged in plaintiffs' complaint, it is clear that Vantine was aware before he underwent surgery of the opinion that such surgery was not necessary. He elected to follow Dr. Echeverria's advice and undergo such surgery voluntarily.

Plaintiffs further complain of the defendant, Wausau, by saying that Mr. Vantine was never notified by Wausau of the contents of Dr. Friedman's report. However, it is undisputed that Dr. Friedman personally informed Mr. Vantine that he would not recommend such surgery. Mr. Vantine was similarly made aware of Dr. Heller's opinion that such surgery was not necessary. Thus, Mr. Vantine knew before his surgery that two other physicians were opposed to it.

Plaintiffs have also admitted that on October 26, 1982, Attorney Stutsman wrote a letter to Judge Rader requesting an entry showing that Mr. Vantine withdrew his petition and claim for bad faith attorney fees in connection with the aforesaid Industrial Board proceedings and that such issue was no longer pending before the Industrial Board. Shortly thereafter, Judge Rader entered an order dismissing Mr. Vantine's workmen's compensation application indicating that no other issues needed to be resolved on November 1, 1982.

### A.

■ In paragraph 14 of plaintiffs' complaint appears the following:

Each of the actions by defendant were fraudulent ... and intended to deprive plaintiff of his employment benefits and benefits in which [sic] he was entitled under the workmen's compensation laws of Indiana.

Vantines' claim does not state a claim for fraud. It is well established in Indiana that the essential elements of actual fraud are as follows: a material representation of past or existing facts, which representation is false, made with knowledge or reckless ignorance of its falsity, which causes the reliance to the detriment of the person relying upon it. *Carrell v. Ellingwood,* Ind. App., 423 N.E.2d 630 (1981); *Blaising v. Mills,* 176 Ind.App. 141, 374 N.E.2d 1166 (1978).

### B.

■ All of the plaintiffs' claims, including the claim for fraud, are contrary to the exclusive remedy provisions of the Indiana Workmen's Compensation Act.

Ind.Code 22–3–2–6 contains the following exclusive remedies provisions:

Sect. 6. The rights and remedies herein granted to an employee subject to this act on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, as personal representative, dependents or next of kin, at common law or otherwise, on account of such injury or death.

This section is designed to make the Workmen's Compensation Act the exclusive remedy of an employee for personal injury or death by accident arising out of and in the course of employment. It is undisputed that Kenneth Vantine had just such an accident at Elkhart Brass on January 25, 1980, that Elkhart Brass was his employer and that Wausau was Elkhart Brass' workmen's compensation insurer. It is also undisputed that Kenneth C. Vantine filed an application for those workmen's compensation benefits; that various matters occurred between Kenneth C. Vantine and Wausau leading up to two hearings before the individual hearing member and the Full Industrial Board of Indiana, each of which culminated in awards of workmen's compensation benefits to Kenneth Vantine.

From a review of the plaintiffs' complaint, answers to interrogatories and responses to request for admissions, the following factual circumstances summarize the grounds upon which all of the Vantines' claims are based (as they pertain to Wausau):

1. Wausau acted in bad faith because it would not recognize that Dr. Echeverria was an authorized physician within the meaning of Ind.Code § 22–3–3–6.

2. Wausau acted in bad faith by seeking out the services of Drs. Heller and Friedman instead of relying entirely upon the opinion of Dr. Echeverria.

3. Wausau acted in bad faith by way of the scheduling conflicts for Vantine's appointments with Drs. Heller and Friedman.

4. Wausau acted in bad faith because it did not obtain a permanent partial impairment evaluation from Drs. Heller and Friedman and did not advise Vantine that it would not pay for the surgery performed by Dr. Echeverria.

5. Wausau improperly terminated Vantine's temporary total disability benefits.

It is beyond dispute that there was a difference of opinion in the proceedings before the Industrial Board as to whether or not Dr. Echeverria was a physician whose fees were authorized medical expenses within the meaning of Ind.Code § 22–3–3–4.[2]

The awards of the Industrial Board show on their face that this matter was an issue for the Industrial Board's determination and that they determined it in Mr. Vantine's favor. The matter of medical, surgical and hospital services is one of the "rights" the workmen's compensation claimant has under Ind.Code § 22–3–3–4. That statute creates a corresponding obligation on the part of the employer/insurer to provide it, and where its terms are met an employee is not free to elect, at the employer's expense, additional treatment from physicians other than those tendered by his employer. *Perez, supra.*

These corresponding rights and obligations are part and parcel of the Indiana Workmen's Compensation Act and, accordingly, in any case such as this one where an industrial accident has occurred, the rights and remedies under the statute are "for personal injury by accident arising out of and in the course of the employment" within the meaning of the exclusive remedy provision. To the extent the Vantines seek to impose liability upon Wausau for a failure to recognize the legitimacy or compensability of Dr. Echeverria's services, the same was fully and finally adjudicated by the Industrial Board of Indiana and is barred by the exclusive remedy position.

The Vantines also seek to impose liability upon Wausau for having obtained the opinions of Drs. Heller and Friedman, when it is alleged that they should have limited themselves exclusively to the opinions of Dr. Echeverria. Again, however, such allegations, even if true, are so intertwined with the Indiana Workmen's Compensation Act that the exclusive remedy provision must prevail.

Ind.Code § 22–3–3–6 provides in relevant part:

> After an injury and during the period of claimed resulting disability or impairment, the employee, if so requested by his employer or ordered by the Industrial Board, shall submit himself to an examination at such reasonable times and places by a duly qualified physician or surgeon designated and paid by the employer or by order of the Industrial Board.

This provision provides that if the employee refuses to submit to or in any way obstructs such examination, his right to compensation and his right to prosecute his workmen's compensation claims will be stayed until the refusal or obstruction is remedied. This section discloses a legislative intent to provide an avenue for the employer to discover the true physical condition of the employee. *Pedigo v. Miller,* 175 Ind.App. 97, 369 N.E.2d 1100 (1970). Wausau had the statutory right to have such examinations performed by Drs. Heller and Friedman. Both such examinations were arranged by Wausau, despite the con-

---

**2.** In the Indiana Workmen's Compensation Act the word "employer" includes the employer's insurer where applicable by virtue of Ind.Code § 22–3–6–1(a). *Baker v. American States Insurance Co.* Ind.App., 428 N.E.2d 1342 (1981).

flict in scheduling of appointments. The Vantines impliedly admit, and there is no reason to disbelieve, that the physician's fees in connection with such examinations were paid by Wausau. Wausau was within its rights to get a medical opinion from Dr. Heller and to get a second opinion about the nature, extent and severity of Mr. Vantine's claim of temporary total disability and need for medical services. Similarly, Dr. Friedman's report shows on its face that Dr. Friedman was requested by Wausau to make the principal determination of whether surgery was necessary, a matter which developed during the course of the workmen's compensation claim rather than at the outset. Dr. Friedman's report also reveals that he was specifically requested to give Wausau an opinion as to whether such surgery was medically necessary. It is equally undisputed from the Vantines' admissions of record that Mr. Vantine knew of the time of his visit with Dr. Friedman, that Dr. Echeverria had scheduled him for surgery, that such surgery was, in fact, scheduled for October 2, 1980, that Mr. Vantine so notified Dr. Friedman of the scheduled surgery, and that Mr. Vantine was informed both by Drs. Heller and Friedman that, in their opinions, such surgery was not necessary. The question of the medical necessity for such surgery was clearly an issue before the Industrial Board of Indiana. In Judge Rader's findings of fact and conclusions of law, he found:

> It is further found that notwithstanding the examinations and admonitions of Drs. Friedman and Heller, Dr. Echeverria continued to be the attending physician, and that the expenses of Dr. Echeverria constitute statutory medical expense.

The Industrial Board found in favor of Vantine on the issue of whether such surgery was medically necessary, determining that it was, and ordering Wausau to pay for it.

■ This court is required to look at this record in the light most favorable to plaintiff when passing upon a motion for summary judgment. Rule 56, F.R.Civ.P. It will be assumed, *arguendo,* that Wausau

was responsible for setting up the appointments and that the confusion about the appointments was due to a lack of communication between Wausau and Kenneth Vantine. As already noted, these appointment and the examinations which followed occurred only as a result of the statutory enactment of Ind.Code § 22–3–3–6, allowing Wausau the right to have such physical examinations performed to determine the nature and extent of Mr. Vantine's claimed injuries. It would be impossible to separate the occurrence of these appointments and, for that matter, the corresponding mix-ups in the scheduling dates from the provisions of the Act. The rights and remedies which Vantine pursued in the workmen's compensation administrative proceedings were so intertwined with the matters of scheduling the appointments that the exclusive remedy provision is applicable hereto.

### C.

■ Permanent partial impairment benefits are intended to compensate an injured employee for the permanent character of an injury after temporary total disability has ceased. The distinction between "disability" and "impairment" is explained in *Covarubias, supra.* The Indiana Workmen's Compensation Act has a specific schedule of benefits for permanent partial impairment as well as permanent total disability benefits. Ind.Code § 22–3–3–10. The *Covarubias* case teaches that once an injury has reached a permanent and quiescent state, or a state of "stability", the claimant is no longer entitled to temporary total disability benefits. See also, *White v. Woolery Stone Co., Inc.,* Ind.App. 396 N.E.2d 137 (1979), and *Goodman v. Olin Matheison Chemical Corp.,* 174 Ind.App. 396, 367 N.E.2d 1140 (1977).

Mr. Vantine had been seen by both doctors before his surgery and was still receiving treatment from Dr. Echeverria at the time of these appointments. It is also undisputed that while Wausau terminated temporary total disability benefits upon receipt of Dr. Heller's report, it resumed the same on the basis of Dr. Friedman's exami-

nation and report. Therefore, it is undeniable that Mr. Vantine was temporarily totally disabled up to and including the time for which he received temporary total disability benefits. *Covarubias* held that where a patient is still getting treatment from a physician and his condition has not stabilized, he is entitled to temporary total disability benefits. Accordingly, Wausau would not have been concerned with obtaining a permanent partial impairment rating because the condition had not yet reached a quiescent state.

Plaintiffs make the allegation that Wausau never requested a permanent partial impairment evaluation of Mr. Vantine from either Dr. Heller or Dr. Friedman. Assuming this to be true, the Vantines do not explain how that entitles them to damages. In any event, the undisputed facts show that both Dr. Heller and Dr. Friedman were of the opinion that Mr. Vantine could return to work.

Mr. Vantine was ultimately awarded 100 weeks of compensation at the rate of $75.00 per week for his 20% permanent partial impairment of the body as a whole. The rights of Mr. Vantine to such permanent partial impairment benefits were not affected either by the failure of Drs. Heller or Friedman to express opinions in that regard, or by the failure of Wausau to obtain these opinions. Those rights spring from the Indiana Workmen's Compensation Act, including its exclusive remedy provision. Those benefits were paid because of the personal injury Mr. Vantine sustained and exclude all other rights and remedies of Mr. Vantine, his dependents or next of kin.

Temporary total disability benefits are also benefits which are provided for under the Indiana Workmen's Compensation Act. Ind.Code § 22–3–3–8. Mr. Vantine's rights to temporary total disability are determined by the Act and case law interpreting the same. Hence, "disability" means the inability to work, and temporary total disability benefits terminate when an employee is able to return to work. Wausau terminated Vantine's disability benefits for the first time when a qualified physi-

cian, Dr. Heller, advised that Mr. Vantine could return to work. Wausau terminated his benefits the second time when a second physician, Dr. Friedman, testified as to when he could return to work.

At the hearing before the Industrial Board one of the issues was that of compensable temporary total disability beyond October 30, 1980.

At the hearing, it was an issue as to whether Vantine was entitled to temporary total disability benefits after Wausau's second termination. The Board held in favor of Mr. Vantine, finding that his condition became permanent and quiescent on January 13, 1981, and ordered an additional 10 and 5/7th weeks of temporary total disability benefits for the period October 30, 1980 to January 13, 1981, at the rate of $130.00 per week. This finding was consistent with *Covarubias* inasmuch as it was Dr. Echeverria's opinion, as found by the Board, that Mr. Vantine's condition became quiescent on January 31, 1981.

All of these matters pertain to rights and remedies under the Indiana Workmen's Compensation Act because of the industrial accident Mr. Vantine sustained. Therefore, the exclusive remedy provision is clearly applicable to any claims brought here for additional temporary total disability benefits.

This case is distinguishable from *Baker v. American States Insurance Company,* Ind. App., 428 N.E.2d 1342 (1981). In *Baker,* the plaintiff, while employed by Claude Wright, injured his left eye. American States issued a policy of workmen's compensation to Claude Wright. Baker alleged that adjusters for American States fraudulently and knowingly made false statements to him to the effect that a Dr. Wilson and other examining physicians had rated Baker's permanent partial impairment at 24.5% of the left eye, when in reality it was 62%. These false statements allegedly were made to induce Baker to settle his compensation claim. Baker contended that the true impairment rating was concealed from him so

as to defraud him and delay the payment of his full benefits.

One of the issues in *Baker* was whether the exclusive remedy provision barred the plaintiff's claim. The court emphasized that the exclusive remedy provision, Ind. Code § 22–3–2–2, was designed to make the Act the exclusive remedy "for personal injury or death by accident arising out of and in the course of the employment," but that Baker was not attempting to recover damages for his injury. Rather, the plaintiff was attempting to recover damages for knowing misrepresentations made by American States to induce him to settle. The court held that Baker could not have brought a lawsuit against his employer for damages for injuries to his eyes. To the extent, therefore, that Vantine is making any claim for additional workmen's compensation benefits, his claims are similarly barred.

Medical bills are a form of compensation under the Indiana Workmen's Compensation Act where they are necessitated by an industrial accident. The plaintiffs' claim that Wausau improperly terminated Vantine's temporary total disability benefits, notwithstanding the fact that Vantine was paid what he was able to prove before the Industrial Board. His claim is one for Workmen's Compensation Benefits under the Indiana Workmen's Compensation Act and not one to be brought in a civil action. It is barred by Ind.Code § 22–3–2–2.

What further distinguishes this action from *Baker* is that Baker was attempting to recover damages for misrepresentations. Specifically, he sought attorney fees (which the court held was not properly recoverable) and the physician's fees for examining him and making a written report concerning the degree of his permanent impairment. He also claimed mental anguish. Since these damages did not "arise out of and in the course of Baker's employment", the court held that they were not barred by the exclusive remedy portion of the Workmen's Compensation Act, i.e., that they stated claims for relief. However, in this case,

aside from the Vantines' claim for unpaid medical bills and additional temporary total disability, the Vantines seek "lost insurance benefits resulting from a wrongful termination of his group insurance benefits and all sums lost due to the need to borrow money to pay house payment and medical bills."

The claim for unpaid medical bills and temporary total disability is barred by the Indiana Workmen's Compensation Act. The claim for "lost insurance benefits" is a result of the co-defendant's (Elkhart Brass) alleged termination of all group insurance benefits for the plaintiff and his dependents arising out of his employment. Such loss of insurance benefits does not pertain to Wausau, as shown on the face of the plaintiffs' complaint.

As far as the need to borrow money to make house payments and medical bills is concerned, whatever money was borrowed to pay medical bills is simply an indirect claim for workmen's compensation benefits. The need to borrow money to make a house payment is alleged to be the result of the termination of temporary total disability benefits and the refusal to pay medical benefits by Wausau.

In *Baker,* the plaintiff sought mental anguish damages and out of pocket expenses for a physician to testify on his behalf because a fraud had allegedly been perpetrated upon him. In this case, the Vantines seek something entirely different. They seek to be reimbursed for moneys they borrowed in order to make house payments, notwithstanding the fact that the same disability benefits which could have contributed towards making the house payments were later recovered by Vantine by way of the Industrial Board award. The Vantines' claim, therefore, is a disguised claim for temporary total disability benefits and is therefore distinguishable from *Baker.*

It should also be noted that the Vantines have neither alleged nor do their answers to interrogatories or responses to request for admissions suggest conduct on the part of Wausau that rises to the level of fraud such as that which occurred in *Baker.*

From a review of the complaint, there is no allegation that any act or omission involved anyone other than Wausau, Elkhart Brass or Kenneth Vantine. The factual assertions contained in the complaint and the apparent underpinnings of the legal theories advanced, even if true, pertain to Kenneth Vantine only. Neither the plaintiffs' answers to interrogatories nor responses to request for admissions suggest that Rebecca Vantine had any role to play in the dealings between Elkhart Brass and Wausau or Elkhart Brass, Wausau and Kenneth Vantine. She appears to be named plaintiff merely because she is the wife of Kenneth Vantine. The complaint advances no allegations that suggest that Rebecca was harmed or damaged in any special way, e.g., loss of consortium. She was not the injured party and she had no employment relationship with Elkhart Brass. The complaint fails to state a claim upon which relief can be granted Rebecca Vantine. These claims, which are now being reoffered, were dismissed on September 9, 1983.

## II. ELKHART BRASS' MOTION

Defendant Elkhart Brass has relied on the following in its motion for summary judgment. Plaintiff Kenneth Vantine was employed by Elkhart Brass at its facility located in Elkhart, Indiana, from September 28, 1979 until May 29, 1982. There were collective bargaining agreements between the plaintiff's employer and his representative union at all times material here. The employment relationship between Elkhart Brass and plaintiff was covered by the terms of these agreements, both of which provide that all dismissals of employees shall be for proper and just cause. The agreements also provide that an employee having any grievance with Elkhart Brass shall attempt to settle that matter in the manner provided in the agreement' grievance procedure. The procedure provides for a four step method of resolution, the last step being final and binding arbitration.

Any employee, or the Union, has the right to file a grievance concerning any dispute or difference with Elkhart Brass under the agreement and the grievance/arbitration procedure is the sole and exclusive method of settlement of any such dispute. If a grievance is taken to arbitration, the decision of the arbitrator is final and binding on the Union, its members, the employee or employees involved and Elkhart Brass.

Article 3, Section 4(c) of Agreement A provides that sick leave will be granted to employees for a period of one year, or a period of time equal to their seniority, whichever is shorter. After this period has expired, the employee reverts to a layoff status. This same Article in Section 1(i) provides that an employee's seniority ends and he is effectively terminated if he is laid off for a period equal to his seniority at the time of the layoff. This same provision is contained in Article 3, Section 3.1.12 of Agreement B.

Plaintiff was employed by Elkhart Brass on January 25, 1980 when he was allegedly injured while at work. His first day off work following this injury was January 28, 1980. Plaintiff was placed on sick leave on that date and retained such status until he was placed on layoff status effective January 28, 1981 in accordance with the above-noted provisions.

On April 22, 1981, the Union filed a grievance alleging that Elkhart Brass had violated the term of Agreement A when it placed plaintiff and another employee on sick leave and layoff status pursuant to Article 3, Sections 1(i) and 4(c). It was the Union's contention that absent employees injured on the job should be handled under Section 4(a) of Article 3 which provides for the granting of leaves of absences. The grievance was processed through the first three steps of the above-referenced grievance procedure and, because the matter was not resolved, it was submitted to an arbitrator for final and binding resolution.

An arbitration hearing was held concerning the grievance on January 20, 1982. The Union represented the interests of plaintiff

at this hearing. Both parties presented evidence and conducted cross-examination. On August 16, 1962, the Arbitrator issued his award, concluding that Elkhart Brass' actions in regard to plaintiff were not violative of the Agreement.

Plaintiff remained on layoff status from January 28, 1981 until his termination by Elkhart Brass on May 29, 1982. Subsequent to plaintiff's being laid off, Elkhart Brass and the Union, acting in its capacity as plaintiff's collective bargaining representative, entered into a written agreement dated June 4, 1983. This agreement provided that if the above-noted arbitration was resolved in Elkhart Brass' favor, plaintiff's May 30, 1982 removal from the seniority list and his subsequent termination would not be protested through the grievance procedure. Thus, if Elkhart Brass acted correctly in laying off plaintiff, it had the right to end his employment according to applicable contract provisions. Because the award from the Arbitrator was in favor of Elkhart Brass, neither plaintiff nor the Union filed a grievance concerning his termination.

The complaint in this case alleges that Elkhart Brass "wilfully, wantonly and recklessly" placed him on layoff status on January 28, 1981 and terminated him on May 29, 1982 in retaliation for plaintiff having exercised his rights under the Workmen's Compensation laws of Indiana and in violation of the Agreement.

■ Indiana follows the employment-at-will doctrine. Therefore, courts of this state have found that employment relationships which are not for a definite term and are not supported by consideration from the employee to the employer are terminable at will. *Ryan v. J.C. Penney Co., Inc.,* 627 F.2d 836 (7th Cir.1980); *accord, Pepsi-Cola General Bottlers, Inc. v. Woods,* Ind.App., 440 N.E.2d 696 (1982); *Ohio Table Pad Company of Indiana, Inc. v. Hogan,* 167 Ind.App. 1, 424 N.E.2d 144 (1975). The Supreme Court of Indiana has held that there is an exception to this rule when an employee is discharged solely in retaliation for his or her exercise of a statutorily conferred right. *Frampton v. Central Indiana*

*Gas Company,* 260 Ind. 249, 297 N.E.2d 425 (1973). Thus, in Indiana an employer may not discharge an employee-at-will in retaliation for his or her filing of a claim under the Indiana Workmen's Occupational Diseases Act.

While this exception to the employment-at-will doctrine is followed by courts in several states, it has been held that an employee who alleges that his or her discharge was in retaliation for the exercise of a statutory right may not maintain a tort action for wrongful discharge if such employee is covered by a collective bargaining agreement which provides that all discharges must be for just cause. *Lamb v. Briggs Mfg., A Division of Celotex Corp.,* 700 F.2d 1092 (7th Cir.1983).

In *Lamb* the Seventh Circuit was interpreting an Illinois Supreme Court case which held, as did *Frampton,* that an employer may not discharge an employee in retaliation for filing a claim under that state's workmen's compensation act. At issue was whether Illinois law provided a cause of action in tort for retaliatory discharge to a plaintiff/employee who is covered by a collective bargaining agreement which provided for just cause discharges. The court found that such a plaintiff/employee did not have a cause of action in tort.

In reaching this conclusion, the court in *Lamb* noted that the Illinois Supreme Court in its prior decisions had been guided by a desire to protect at-will employees, who are otherwise unprotected, from such retaliatory discharges. However, because employees covered by a labor contract have protection from such discharges, the court found that these employees did not require the additional protection of the judicial system, noting:

> ... [T]he availability of an alternative contract remedy obviates the need for a separate tort action.... [A]llowance of such separate tort would unreasonably disrupt the orderly arbitration procedure contemplated in the union contract.

700 F.2d at 1093.

■ Thus, the court, also citing *Frampton,* found that it was the unfairness of

forcing employees to choose between employment and workmen's compensation benefits that was the basis for state court decisions which have carved out the exception to the employment-at-will doctrine. Because an employee who is covered by a collective bargaining contract does not suffer this dilemma, he should not bring a tort action for wrongful discharge, but must pursue his contractual remedies. *Lamb, supra.*

In this case, plaintiff at all times during his employment was covered by collective bargaining agreements which provide for "just cause" discharges.

This court has here concluded that the *Lamb* reasoning and result constitutes a logical and correct application of *Frampton* since the employee in *Frampton* was an at-will employee.[3]

■ It has long been held that courts should encourage employers, unions and employees to resolve their differences through contractually provided grievance and arbitration procedures. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrier & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Co.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). (The so-called *Steelworkers Trilogy*).

■ When a collective bargaining agreement contains a grievance/arbitration procedure intended to be the exclusive remedy for breaches of the agreement, an employee may bring suit for breach of the agreement *only* if that employee is able to prove that the union breached its duty of fair representation. *DelCostello v. Teamsters,* —— U.S. ——, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). As noted by the Supreme Court in *U.P.S. v.*

*Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).

> To prevail against either the company or the Union ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract, but must also carry the burden of demonstrating a breach of duty by the Union.

451 U.S. at 66–67, 101 S.Ct. at 1565–66. See also, *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

The employee may sue either the employer or the union, but the case to be proven is the same. *DelCostello, supra.* Thus, in the absence of an allegation that his union breached its duty of fair representation, an employee may not bring an action under § 301 to upset an accord reached on a dispute which is, by contract, final and binding on all parties. *Vaca v. Sipes, supra; Mitchell, supra.*

■ In this case, plaintiff alleges that Elkhart Brass violated the terms of the Agreements when it placed him on layoff status and subsequently terminated him. A grievance was filed concerning the issue of his layoff and the arbitration award which was the final result of the grievance/arbitration procedures is binding on all parties—including plaintiff. Acting as plaintiff's collective bargaining representative, the Union agreed with Elkhart Brass that if, as a result of the arbitration of the above-noted grievance, it was determined that Elkhart Brass did not violate the Agreement by placing plaintiff on layoff status, no grievance would be filed concerning his termination. Plaintiff may only seek to have these resolutions overturned if he alleges and proves that the Union failed to represent him fairly during the grievance/arbitration process and when it agreed that Elkhart Brass acted properly in terminating him. Because there is no allegation or evidence of such failures, plaintiff fails to state a cause of action under § 301. *Vaca v. Sipes, supra.*

---

**3.** The court which decided *Lamb* has most recently adhered thereto. See *Metz v. Tootsie Roll Industries et al,* 715 F.2d 299 at 307 n. 10 (7th Cir.1983).

For all of these reasons the defendants are each and both entitled to judgment as a matter of law.

The Clerk shall enter summary judgment in favor of both defendants and against these plaintiffs. Costs are assessed against the plaintiffs.